## WILLIAM AND ROBERT EANES *v.* THE STATE.

1. MURDER — MANSLAUGHTER — "ADEQUATE CAUSE." — The Penal Code (article 597, § 4) makes insulting words or conduct towards a female relative of the slayer an adequate cause for the passion which reduces voluntary homicide to manslaughter, provided (art. 598) the killing occurred immediately upon the happening thereof, or so soon thereafter as the slayer, having been informed of the insults, met with the person killed. These provisions render inapplicable to such a case the requirements of article 594 that the provocation must arise at the time of the killing and the passion be not the result of a past provocation. The time intervening between the slayer's appraisal of the insult and his first meeting with the deceased is not a material consideration; but it is essential not only

that the adequate cause have a status in the evidence, but that the state of the slayer's mind predicated thereon did actually exist at the time he killed the deceased.

2. SAME.— In the state of case contemplated in said articles 597 and 598 four issues of fact are presented: 1, the occurrence of insulting words or conduct on the part of the deceased towards a female relative of the accused; 2, whether that was the real provocation which induced the killing; 3, whether the killing took place immediately on the happening of the insult, or as soon thereafter as the accused, having been apprised thereof, met with the deceased; and 4, whether the accused, when he killed the deceased, was affected by such a degree of anger, rage, resentment, or terror as would commonly, in a person of ordinary temper, render the mind incapable of cool reflection. But in determining these issues the jury should be instructed to consider the aspect in which the evidentiary circumstances presented themselves to the accused at the time he acted upon them.

3. SAME — CHARGE OF THE COURT.— With reference to the issues above indicated, the jury should be instructed upon the legal import of the statutory phraseology descriptive of the particular passion involved in the issues. For instance, if anger be the passion imputable to the provocation, its characteristics should be so explained that the jury can distinguish it from rage, resentment, or terror. See the opinion in extenso on this subject.

4. SAME —"COOLING TIME."— The evidence on such issues may also, as in the present case, necessitate an exposition of the legal import of "cooling time;" i. e., interim sufficient for the mind of the accused to have become calm enough to enable him to act coolly and understandingly in view of the probable consequences.

5. SAME.— If, as in the present case, the slayer did not act on his own knowledge, but on information given him by others, the question with regard to the "cooling time" is not whether, after he received the information and before he acted upon it, a sufficient time elapsed for his mind to cool, but whether his anger still prevailed when he first met with and killed the deceased.

6. CHARGE OF THE COURT.— When there is no evidence tending to prove a lower grade of offense than that charged in the indictment, the court may well decline to instruct upon such lower grade; but, on the other hand, the instructions given to the jury should never in effect withdraw from them the issue of guilty or not guilty.

7. SAME — REASONABLE DOUBT.— When necessary, as it often is, that the jury be instructed on the doctrine of reasonable doubt as between the degrees of the offense charged, the instruction should be expressed in language comprehensible to non-professional men.

This is scarcely accomplished by the abstract proposition that "the rule of reasonable doubt applies to the grade of offense."

8. PRIVILEGE OF COUNSEL.— When an advocate grossly abuses his privilege to the manifest injury of the opposing party, it is the duty of the court to stop him *instanter;* and persistent impropriety of this character may be cause for new trial. But a party whose own outrageous conduct provoked the impropriety is not entitled to complain of it.

9. SAME — PRACTICE.— If the course of a trial be interrupted by scenes of such excitement as will probably frustrate a fair and impartial consideration of the case by the jury, the court should promptly exert its amplest authority to suppress the disturbance; but if this be ineffectual to restore immediate order and decorum, the further progress of the trial should be postponed, and adequate measures to enforce order be provided for the resumption of proceedings. Proper practice under such circumstances will obviate any occasion for resort to the revisory authority of appellate tribunals.

APPEAL from the District Court of Travis. Tried below before the Hon. E. B. Turner.

In May, 1880, the grand jury of Travis county presented an indictment by which the appellants, William Eanes and Robert Eanes, were jointly charged with the murder of C. D. McMillan, on February 19, 1880, by shooting him with pistols. In July, 1880, they were jointly tried and both convicted of murder in the first degree, but the punishment of William Eanes was assessed at death, and that of his brother and co-defendant at a life-term in the penitentiary. Their motion for a new trial being overruled, they appealed.

The case turns upon facts and incidents of a very interesting character, and involves, as will be seen by the opinion of this court, a number of novel and important questions. The rulings on some of these questions necessitate a full presentation of the material details of the elaborate evidence adduced both by the prosecution and the defense. It may be stated in a general way that the proof was clear that McMillan came to his death, on the day alleged in the indictment, and in his own house and

the presence of his young wife, by pistol shots fired by one of the appellants, the other being in the house at the time. The provocation relied upon by the defendants was the ravishment and ruin of their sister, imputed by them to the deceased, on information communicated to them by her early in the day on which the killing was done. This line of defense raised the questions chiefly contested in the trial court as well as on the appeal.

At the time McMillan was killed he was residing in the suburbs of the city of Austin, with his wife and their little daughter, Rosa, who was about eight years old. Previously they had lived several miles in the country, and near the father of the appellants, and while there an intimacy had grown up between Mrs. McMillan and Miss Annie Eanes, the young sister of the appellants. About a month before McMillan was killed, this young lady remained with Mrs. McMillan for a week or ten days, and when she left she came to Austin in company with McMillan, and, instead of returning to her father's, she was "missing" until discovered by a brother-in-law a day or two before the homicide, at a town about twenty miles from Austin.

Mrs. Lizzie McMillan, the widow of the deceased, was the first witness examined by the State. She testified that about one o'clock on the 19th day of February, 1880, the two defendants, William and Robert Eanes, came to her house, shook hands with her and came in, sat down, and engaged in a conversation from which she understood that Miss Annie Eanes was still missing. She told them that she had heard that Maurice Moore (a brother-in-law of the appellants, and separately indicted for complicity with them) had traced Annie's trunk to the depot of the International Railroad, and witness asked where Maurice Moore was. William Eanes replied that Moore was at home and had abandoned the search for Annie, and that it would have to be continued by Robert Eanes and

Charles, a younger brother. To the best of witness' recollection, William Eanes then asked her if McMillan had ever brought any letters to Annie during her stay with the McMillans? Witness replied that she did not think her husband had ever brought any letters to Annie, and then Williams Eanes asked if letters could not have been brought to Annie by Mr. Allen, a man who took McMillan's place as the driver of Mr. Hancock's dairy-wagon. William Eanes added that he would like to see McMillan to ascertain where Allen could be found. Witness asked the defendants if they would not stay to dinner, but they said they would go to their uncle's, and would return. In this conversation Robert Eanes took but little part, but was present all the time.

About half an hour after they left, witness' husband came home to dinner, and she told him that William and Robert Eanes had been there and that Annie had not been found. Witness, with her husband and their little daughter, sat down to dinner. While at the table the defendants came to the door, and either witness or her husband got up and went to the door, and they came in. McMillan and William Eanes commenced talking about Miss Annie not having been found, and discussed the color of a trunk she had got from the witness, who then remarked that in the next room there was another trunk, which was painted exactly like the one Annie had got from her. McMillan then got up, and he and William Eanes went into the next room to see the trunk. Witness, without hearing a word pass between her husband and William Eanes, heard a shot, and her husband came running back into the room where she had remained, and, without uttering a word or a groan, he fell upon his face. William Eanes was following and firing at McMillan as the latter came running back into the room where witness was. Witness could not say how many shots were fired, but knew there were several. McMillan had no weapons on his person,

but always kept a pistol in the house. As soon as the deceased fell, the defendants went out of the house. After the shooting the only utterance the witness heard from either of them was the word "sister" in the voice of William Eanes. At both of their visits on that day they were received and treated kindly, and until the first shot was fired the two families, so far as the witness knew, were very friendly, and until the deceased and William Eanes passed into the room to look at the trunk nothing had occurred to mar that friendship. Witness had known the Eanes family about fifteen months. When McMillan fell, Robert Eanes was not more than two steps from him, but did nothing to stop the trouble. McMillan died instantly after he fell.

Mrs. McMillan was subjected to a very searching cross-examination, which elicited full details of the friendly intercourse which had existed between the families of the deceased and the defendants, and especially of the intimate relations between Mrs. McMillan and Miss Annie Eanes. Witness stated that in the months of April, May and June, 1879, Annie visited her and remained about a week on each occasion. (According to the theory of the defense, Annie was outraged by McMillan during this visit in June.) Between June, 1879, and January, 1880, the witness and her husband, the deceased, repeatedly urged her to come again, but she always had some excuse. In January, 1880, witness had a particular reason for wanting Annie to come, and it was on the 4th of that month, witness thought, that Annie next came after the visit in the preceding June. McMillan had, without the witness' knowledge, written to Annie that witness wished to see her on particular business; and when Annie came, she did so along with McMillan in the dairy wagon, though witness had not requested him to go after her. She remained until the 8th of the same month of January. Witness was expecting to be confined either about the

15th or the 27th of that month, and wanted to have Annie with her during that emergency. McMillan did not tell witness why he brought Annie so long in advance of the occasion, and when she went away on the 8th he took her to town in the dairy wagon. Witness' baby was born on the 13th, and on the Sunday week following, Annie returned and stayed until the ensuing Tuesday week. Her increased size was then observed by the witness, who, however, imputed it to increasing corpulency until she heard that Annie had been seduced, and then her condition was spoken of by witness and her husband. When Annie left McMillan's the last time, she started to town with Mr. Allen, in the dairy wagon, and took with her the trunk witness let her have. She hesitated about going with Allen, who was a stranger to her, and witness asked McMillan to take her. He replied "Allen ain't going to bite her," but agreed to go, and afterwards said he had overtaken them, and that he and Annie got off the dairy wagon and took a street car, from which one of them got off on the Avenue in Austin and the other on Pecan street. At that time he got money from Hancock, as the witness thought. He told witness that he asked Annie if he should leave her trunk at her uncle's in Austin, and she said for him to leave it at Mrs. Alyea's; but that he told Allen to leave it at the Webb House, opposite Alyea's, as Allen did not know where Alyea lived. Deceased told this to witness before Annie was missed. On Saturday before deceased was killed, Robert Eanes, Sr., the father of the defendants, came and asked witness "where's Annie?" Witness was surprised by the inquiry, and replied that Annie had left witness' house the Tuesday week before. He said she had not gone home. He stayed but a few minutes, and as he stepped to the door witness told him that during the last summer Annie had jestingly said something about running away to get married; to which he replied "it's something deeper than that." He told

witness to tell McMillan he wanted him to help find
Annie. When McMillan came home witness asked him if
he had seen Mr. Eanes, and gave him the message about
helping to find Annie. He was very sorry she was miss-
ing and seemed much surprised, but, not knowing where
she was and having his own business to attend to, he did
nothing about seeking her. Witness and deceased never
had any altercation with each other about Annie Eanes.
Witness had a faint remembrance that Annie, during one
of the visits in 1879, asked for the key to the door of the
room she occupied, and witness thought she gave her the
key, but was not certain whether that occurrence was
during the visit in June or in a previous one. Witness
thought that Annie slept with her door closed during those
visits. Witness and deceased sometimes slept with their
door closed, and sometimes with it open; and their bed
was so placed that either could get out of it on their re-
spective side. McMillan kept a pistol under the head of
a bed which stood in the room into which he and William
Eanes went to look at the trunk just before the shooting
began.

Re-examined by the State, Mrs. McMillan stated that
when her husband was shot she ran out of the house and
hallooed "murder," and that when she came back into
the house her husband's pistol was under the head of the
bed where it was kept. She never saw her husband and
Annie Eanes exhibit any undue intimacies, but had seen
Maurice Moore kiss Annie, and once saw him try to pull
her down on his lap. A man named Mitchell was said to
be engaged to marry Annie Eanes. Witness never saw
her husband have a letter addressed to Mitchell, nor did
he ever assume the name of Mitchell. She never heard
of Annie complaining of any treatment towards her on
the part of McMillan.

On cross-reëxamination by the defense the witness
stated that it was in 1878 and at Maurice Moore's own

house she saw him try to pull Annie on his lap, and McMillan as well as witness was present. Witness never observed any difference in the deportment of Maurice Moore towards Annie and towards another sister-in-law.

At the instance of the State, Mrs. McMillan identified three letters written her by Annie Eanes, and dated the 14th and 16th of December, 1879, and the 17th of January, 1880. The tone of these letters was one of cordial friendship, and their only noticeable feature is the expressed and reiterated wish of the writer to come and visit Mrs. McMillan if the latter would come for her. Their only allusion to McMillan is in the last of them, which suggested that her brother Charles would bring her to Mrs. Alyea's in Austin, and from there Mr. McMillan could take her to his house. Mrs. McMillan testified that she talked with many persons immediately after the killing, and told them that the sister of the man who killed her husband was with child, and she supposed that her husband had been killed on suspicion, but she did not think him guilty. Witness knew of no other cause why the defendants should have killed him. Maurice Moore had told her, on Sunday next before the killing, that Annie was seduced, and that it dated back to one of her visits to McMillan's. Moore's expression may have been that the only opportunity for Annie's seduction was on those visits.

In the foregoing version of the very elaborate testimony of the deceased's widow, many matters of detail and explanatory circumstances are omitted.

Dr. Bibb, for the State, testified that he examined McMillan's body on the day he was killed, and found six gun-shot wounds. One of the balls had entered between the breast bone and the navel and passed out at the back. The other five had entered from the rear; one of them penetrated above the left hip, and the others on the right side of the back. The deceased was lying on his face,

with the head towards the door entering the house, and the feet near the door between two rooms.

Mr. Phillips, for the State, testified that immediately after McMillan was killed he, the witness, saw the defendant Robert Eanes standing in the street before McMillan's house, and about forty feet from the house. He did not seem to be in any one's custody. Noticing fresh blood on the back of the leg of Robert Eanes' pants, witness asked him if he knew it was there. He looked at it and said he reckoned he got it in the house, and remarked that there was a man killed in there. In reply to witness' inquiries about the killing, Robert Eanes said it was too serious a matter to talk about. Witness was present when the defendants voluntarily surrendered to Maurice Moore; he could not say which of them had the only pistol he saw.

Mrs. C. F. Pearson, a near neighbor of the McMillans, testified that she saw the defendants call twice at McMillan's on the day of the killing. A few minutes after they entered the house at their second call, she heard five shots, and the defendants came out of the house. Each of them had a pistol in hand, and one of the pistols was smoking. The defendant with a heavy beard (William Eanes) was swinging his pistol over his head, and something was said about revenging a woman. He called to a Mr. Hopkins to come on and arrest him, and said he was going to give himself up. He gave his pistol to the other defendant, who had put his own pistol in his pocket. As they came out of the house, they stepped over McMillan's body, which lay about two feet from the front door. Mrs. McMillan was walking the floor; witness heard her halloo "murder," and heard one shot after that. The witness did not then know the defendants. When she saw them make their first call at McMillan's she thought they were kin of Mrs. McMillan, judging by their friendly manner and the cordiality on both sides. The front door was opened after all the shots were fired.

The foregoing, with the three letters of Annie Eanes to Mrs. McMillan, referred to in the latter's testimony, comprises the substance of the evidence on which the case was rested by the State.

Winter Goodloe, testifying for the defense, stated that he had a conversation with Mrs. McMillan when her husband was killed. Replying to witness' inquiry, she told him who did the killing, and witness asked her if she knew the reason they killed him. She replied yes, and said "The fact is, Miss Annie Eanes, a very dear friend of mine, is with child, and my husband is accused of being the father of it;" adding, in substance, that he was killed for that reason.

James Hancock, for the defense, testified that in January and February, 1880, McMillan was in his employ as driver of a milk wagon, and they had some words about McMillan not keeping accounts. McMillan said he had not time to keep accounts, and witness proposed to hire another man to drive alternate weeks with him. He said he was tired of it and he quit. Some days afterwards, witness paid to McMillan, on Congress Avenue in Austin, $11.85 in silver. This payment was made about three or four o'clock in the afternoon of the 28th or 29th of January, 1880, as witness first stated the date; but, being shown his testimony as given at the examining trial, he found that the date there stated was from the 4th to the 6th of February. Witness thought that the payment was made on the same day Annie Eanes left McMillan's house.

Charles Eanes, a brother of the defendants, testified that he and Maurice Moore were out on a surveying expedition from early in October, 1879, until the latter part of January, 1880. Witness saw his sister Annie the first day he got back; but, after she next left home, he did not again see her until Maurice Moore brought her to his house from Round Rock in Williamson county.

On his cross-examination the witness stated that in June, 1879, he was in Bell county, and could not say where Maurice Moore was at that time. Witness heard of the killing of McMillan the day after Maurice Moore brought Annie from Round Rock to his house, and never heard her statement until after McMillan was killed. On the day of the killing witness came to Austin along with Maurice Moore, and saw the defendants in Austin. At that time he did not know but expected that somebody would be killed, and expected it would be McMillan, but neither of the defendants had told him so, and they had no arms so far as he knew. He believed his brother William said that somebody would be hurt before night, and witness thought he knew who, and supposed it would be McMillan,—knowing that his sister had been misled, and had been last seen at McMillan's. Annie Eanes was at Maurice Moore's when McMillan was killed, and both of the defendants then knew she was there.

Re-examined by the defense, the witness stated that near a livery-stable in Austin his brother William told him that if a married man had seduced Annie he would have nothing to do with it, but if it was done by a single man he would make him marry her. This was before any of the Eanes family knew that Annie had been raped.

Robert Eanes, Sr., the father of the defendants and Annie, testified that, late in the year 1878, Mr. McMillan was introduced to him as a gentleman who was going to occupy the place near witness. The friendly relations between the families commenced with the sickness of Mrs. McMillan, and the consequent kindness of witness' family. When the McMillans moved away to the Hancock place, they asked the Eanes family to visit them, and Annie did so in April, May, and June, 1879, and not again until January, 1880. In the interim between June, 1879, and January, 1880, notes inviting her to visit the McMillans were constantly coming, and her mother advised her to do

so. When Annie returned home in January, 1880, her mother learned of her pregnant condition, of which the witness had previously had suspicions. About the 10th of February, 1880, witness received, from Mrs. McMillan, the first information that Annie was missing,—that is, information of such a character as convinced him that such was the fact. His son Charles had come after her and had failed to get her, and witness then went to see Mrs. McMillan, who said her husband was out at the Hancock place. Witness asked her where Annie was, and she replied "at home or ought to be." Witness told her No, and that Annie had gone from home, and that he wanted McMillan to help find her. She spoke of a possibility that Annie had run away and married a lover of hers; and witness answered that he thought it was something worse than that, and told her very emphatically to tell Mr. McMillan that witness wanted him to assist in finding Annie. Witness never heard that McMillan took any step to help find her. Annie was delivered of a child on the 12th of March, 1880, and between it and McMillan there is a marked and uncommon resemblance. The eyes are nearly the same in color, the child's laugh is like his, and the expression of its features is the same as his. When Annie was brought home by Maurice Moore her mother was very feeble, and the doctor said that it would kill her to learn of Annie's condition. At witness' request, Maurice Moore went in search of Annie and took her to his own house. Witness had communicated to Moore his suspicions with regard to her condition, and first did so within half an hour after his interview with Mrs. McMillan. Previous to that, witness had told the defendants.

James Mitchell, for the defense, testified that he lived nine miles from Austin, and knew Annie Eanes. He also knew McMillan, and met him late in November, 1879, at the fair grounds near Austin. Witness had received from

McMillan a note of invitation to his house on a previous Sunday evening, when, the note said, a lady friend of witness would be at McMillan's. Witness did not go, and after the fair was over McMillan came to see witness, who expressed regret at his inability to accept the invitation, when McMillan replied that it made no difference, as the lady did not come. Witness asked him who the lady was, and he said "Miss Annie Eanes, of course," and that she would have come but that her mother was sick and had company. After a while McMillan said "You ought to try and see Mrs. Eanes, the old lady." Witness excused himself. McMillan said that Miss Annie had told his wife that she and witness were engaged. Witness did not deny it, and waived the subject with the remark that times were too hard to marry then. McMillan was a stranger to witness, who had seen him but once before they met on the fair grounds. He had then tried to arrange with witness about going on witness' ranche, and that matter was again spoken of at the fair grounds, but no arrangement was made. Witness and Annie Eanes were never engaged. He had addressed her, but she declined him. He had never had sexual knowledge of her, nor ever made to her an insulting or improper proposal. Throughout the neighborhood her reputation was that of a good, honest girl.

On his cross-examination the witness stated that McMillan's only business at the fair grounds was to see him on the subject of Annie Eanes, as McMillan himself said so expressly. Witness thought that McMillan was taking a great interest in him, for a stranger.

Mrs. Alyea, for the defense, testified that she lived opposite the Webb House on Pecan street in Austin. She knew Annie Eanes and remembered the last night Annie stayed at her house. Witness also knew a man who gave his name as McMillan, and who, on three previous occasions, had called at her house to see Annie Eanes. On

the fourth occasion, which was on her last stay at witness' house, McMillan was met at the door by witness' little girl. He asked for Annie Eanes, and when she came to the door they talked to each other in so low a tone that witness could not understand what they said, except that, as McMillan started away, he said "I will leave it at the hotel, then, shall I?" And Annie Eanes replied "yes." About eight o'clock the next morning, Annie Eanes left, saying she was going to her uncle's, who lived in another part of town.

Dr. Cummings, for the defense, testifying as an expert, gave it as his opinion that impregnation might result from a rape. On cross-examination, he stated that it was difficult for a man to rape a well-developed woman by mere force, but that the employment of threats in connection with force was a consideration of importance. He and sundry other witnesses testified that Annie Eanes, previous to the occurrences involved in this trial, bore an unquestioned repute as a chaste, modest and truthful girl. He also stated, as did several others, that the character and reputation of the defendants, as peaceable and law-abiding citizens, was always good prior to the killing of McMillan.

Annie Eanes was the next and by far the most important witness for the defendants. Her testimony, omitting immaterial details, was as follows:

"I am twenty years of age. Robert Eanes, Sr., is my father; defendants are my brothers. I first got acquainted with C. D. McMillan at the Murch place near our house, when he and his family moved there. When they moved there Mrs. McMillan was taken very sick; we did all we could for her; we carried the family their food from our house, and nursed Mrs. McMillan and kept her company until she got up, and she seemed feeble for about three weeks. McMillan and family moved from the Murch place to Judge Hancock's place, and I visited the family

after they moved. I went first, I think, in April, 1879, and stayed one week; again in May and stayed a week or ten days; and again in June and stayed one week. I next visited the family at another house, in January, 1880. The reason I went in January was, Mrs. McMillan had written often, and would send for me and ask me to meet her in town at Castleman's store; but I had not gone, and then McMillan came after me to my father's house. He came on a Sunday and in a milk wagon. I received a note from him a few days before he came; I did not save it. The note requested me to come to his house and see his wife, and that she requested him to write and tell me she wanted to see me on particular business. I received this note three or four days before he came. The reason I did not go from June to January was because McMillan had treated me in such a disgraceful manner I did not want to be where I would be on any terms with him. This treatment of me had been during my visit to his house in June, and was as follows:

" One night he came into my room about midnight. It was in the house on the Hancock place, where McMillan lived. Mr. and Mrs. McMillan, and their little daughter and I were all that were in the house. I was in a room apart from others. I was asleep, and was awakened first by his catching hold of my hands. I pulled one hand loose and struck him in the face and spoke to him, and he told me not to make any noise, that he would not suffer me to do so, and if I did he would take my life. I then yielded to him. He told me at first he would kill me if I resisted. It scared me very much, and frightened and surprised me. He then had connection with me. After he had accomplished his purpose he told me not to tell any one, and that he would always be prepared to kill my brothers if I told them. My room had two windows and one door; on this night the door had not been locked; next morning I asked Mrs. McMillan for the key

and she gave it to me. The reason I did not complain of what McMillan had done was that he had told me he would kill me if I did. I was then nine or ten miles from home and had no means to return home. Next night, I locked my room door; I also closed down the windows. He came into my room again; I don't know how he got in. He came to my bed and insulted and had connection with me as before, threatening me he would take my life if I did not submit, and telling me not to make any noise. There was a child born from the connection he had with me. The child was born on the 12th or 13th of March, 1880; about the middle of the night of the 12th. The connection McMillan had with me took place on the 17th and 18th of June, I think.

"On my January visit at McMillan's I remained only three or four days, and returned about the latter part of January and stayed about eight days. I then knew I was going to become a mother, and McMillan also knew it. When I came away we came to Austin together and stopped at Mrs. Alyea's. We came in Hancock's milk wagon; Mr. Allen driving it. McMillan and I got off the wagon near the Honey church, and got on the street cars. I got off the street car first, at corner of the Avenue and Pecan street, and went immediately to Mrs. Alyea's; and he went on down Pecan street. My trunk was in the milk wagon. I got to Mrs. Alyea's late in the evening; I saw Mr. McMillan that evening at Mrs. Alyea's, and had a conversation with him. He told me that he had the money for me to go off on, and handed it to me, and asked me what he should do about my trunk, which was left at the Webb House. He gave me ten dollars. I went to Round Rock; I went there to stay till the birth of my child. He told me to write to 'Harry Mitchell,' his assumed name. * * * My brother-in-law, Maurice Moore, traced me up and found me at Round Rock. He asked me if I had written to McMillan, and I told him I had written to him

once. I went home with Maurice, and to his house, where I met my sister, his wife, and my sister-in-law, William Eanes' wife, and next morning I met my brothers, William and Robert Eanes. Then I told them what McMillan had done to me; I told them all about it. I heard of McMillan's death next night,— the night of the same day. The defendants came home and told me they had killed him. I never told them before what McMillan had done; had never before told any of my family. * * * Maurice Moore never made an insulting or indecent proposition or advance to me in his life. * * * I communicated to McMillan my situation by a note which I gave him on the road, in the wagon, as he was taking me over to his house in January, 1880. * * * My mother and father both urged me to go between June and January; I declined, but did not explain to them why. One reason was because of my mother's condition of health; and McMillan had told me he would be prepared to kill my brothers, and would kill them, if I told them. When I did tell my brothers, I could no longer conceal my situation. During my visit in January at McMillan's, he came to my room door one night at about one o'clock. I rose up in bed and he went out. The room I was then in adjoined Mrs. McMillan's room. The room I was in when he insulted me in June was not adjoining Mrs. McMillan's; in going from her room then to mine one had to pass on to the gallery and then into my room. When I raised up in bed McMillan laughed in a sort of scornful manner and passed out of the room. This was during my first visit in January, 1880. McMillan used other influences to prevent me from telling what he had done to me at the time in June; he told me he would be prepared to kill my brothers if I told them, and would kill me if I did not yield. He further said that, if I said nothing about it, it would come out all right and never be known."

In her cross-examination Miss Eanes stated that McMil-

lan's little daughter Rosa was sleeping with her in June, 1879, when he first came to her room and violated her person. "What occurred," continued the witness, "did not awaken Rosa. McMillan accomplished his purpose by force and threats. The force he used by holding my hands; he had hold of my wrists. I don't know which hand he used. · He held both my hands out, each of mine in one of his, stretched out from my body, and held me so until he completed the rape, using his hands in holding mine all the time. I resisted the best I could; I resisted by my strength in every way I could, all the time, but made no noise. He first roused me by catching hold ·of my wrists. I don't know whether the door was open or shut; can't tell how he got out of the room; did not get up and shut the door. I was twenty years old, last December. I was in good health at the time of the rape. Mrs. McMillan's health at that time was, I think, good. Rosa did not wake up; she was lying in the bed by my side. He spoke in a moderate tone of voice. I did not halloo; I did speak, but used ordinary tone; I don't think it was loud; I only asked who it was. It alarmed me very much; I did not halloo out; I thought who it was at first, and after he spoke I knew. I could not see and did not notice whether he was dressed in ordinary or night clothes; did not notice which way he went out. I turned myself away from him. I got up, I think, at usual time next morning; I lost all that night's sleep. I told no one what had happened. * * · * I made no effort to get home next day, or go anywhere else. I did not know any of the neighbors. * * * I had slept in Mrs. McMillan's room before this, on the lounge; don't know why I did not go in and sleep in her room the second night; the lounge was still there. Next day, brother Robert came for me; I said nothing to him about it."

On her re-examination by the defense Miss Eanes stated: "I communicated my situation to McMillan in the wagon

on the road from home. He received the note, read it, and tore it up; I informed him of my condition in that note. I told him I could not talk to him; I wanted him to do something for me; I did not want to tell my parents. He said he would do all he could; he proposed that I should go to some place,— I have forgot the name,— I remember it now, New Braunfels; I did not agree; he then proposed I should go to Round Rock, to stay till the child was born. He told me to dispose of it some way and return to father's."

Miss Eanes further testified that the following letter, which was postmarked at Round Rock, February 9, 1880, and addressed to "Mr. Harry Mitchell, Austin, Texas," was written by her to McMillan and intended for him.

"Round Rock, February 9, 1880. · "Mr. Mitchell:

"I write to you to let you know something of my situation. I am at a private boarding house. My board costs me 4 1-2 dollars per week — the cheapest I could get. I will want a good deal more money; at least $14 or $15 more, for washing, Dr.'s bill, and so on. My expense so far, not including board, has been the following: (Here follows several small items amounting to $3.35.) I am troubled to death. Does any of the family — my family I mean — know anything of my being here? For pity's sake, don't let them know it if you can help it. You had better send the money as soon as possible; I might need it.                         Annie M."

The defense also put in evidence a letter dated October 5, 1879, and written to Annie Eanes by Mrs. McMillan. It is replete with expressions of affection and sympathy in general, and especially on account of an injury which the young lady had received in her eyes. A cordial invitation was urgently pressed on the sufferer, in behalf of both the writer and her husband, the deceased, to come and stay with them in order to be convenient to medical

attendance. The defense manifestly suspected that the real import of this letter had reference to the pregnant condition of the girl; but Mrs. McMillan, on her cross-examination, positively denied that such was the case, and her testimony implies that, at the date of the letter, she was not aware of the unhappy condition of her correspondent.

The relative situations of the rooms and beds respectively occupied by Miss Eanes and the McMillans in June, 1879, was shown by description and diagram. Miss Eanes slept in a small room cut off of the north end of the gallery extending along the front of the house, and her bed stood in the northwest angle of the room. The McMillans occupied a room which fronted on the gallery at its other extremity, and their bed stood near its southwest corner. There was no contact of the two rooms, and no immediate communication between them, but each was provided with a door which opened upon the gallery, and the traversable distance between the beds was probably about forty feet.

In rebuttal, the State re-examined Mrs. McMillan, who testified that she did not miss her husband from their bed-room during either of the nights in June, 1879, referred to by Miss Eanes, and did not think he could have got out of their bed, absented himself, and returned, without her becoming apprised of it. Witness was not a sound sleeper. If Miss Eanes had talked in her room in an ordinary tone of voice witness could have heard it, as she had heard her little daughter talking in Miss Eanes' room while witness was in her own. Nor did witness observe any change of manner in Miss Eanes during the visit; she always seemed cheerful. There was conflicting evidence as to whether Miss Eanes' baby resembled the deceased.

The defense offered Maurice Moore as a witness, but he was excluded on the State's objection that he was indicted

for complicity with the defendants on trial. A serious interruption of the course of proceedings occurred during the concluding argument of the county attorney to the jury. The details of the disturbance are sufficiently given in the opinion of the court.

*Walton, Green & Hill, Sheeks & Sneed,* and *R. M. Russell,* for the appellants.

*Horace Chilton,* Assistant Attorney General, for the State.

WHITE, P. J.   On an indictment for the murder of one C. D. McMillan, alleged to have been committed in Travis county on the 19th day of February, 1880, appellants were tried on the 9th day of July, 1880, in the District Court, and by verdict and judgment were found guilty of murder in the first degree,— the punishment as to William Eanes being affixed at death by hanging, and that of Robert Eanes at imprisonment for life in the State penitentiary.

Over and above its importance on account of the gravity of the penalties imposed, the case involves many interesting features which might, if necessary, open up a wide field for discussion. But in connection with the conclusions which have forced themselves upon our minds with irresistible conviction upon a mature consideration of the record, we propose, in our endeavors to arrive at a true and proper disposition of the case as presented on this appeal, only to discuss those questions which have occurred to us as embracing matters of vital importance to the real issues involved. Preliminary to such discussion it may not be amiss to state briefly, but in substance, the facts essential to the elucidation of these questions.

In the months of November or December, 1878, the deceased and his family moved to the neighborhood of

the family of the Eaneses,— that is, of the father of these appellants,— and the two families resided within about one hundred yards of each other for some six weeks or two months. An intimacy soon sprang up between the members of the respective families, which soon ripened into the warmest friendship, especially between Miss Annie Eanes, sister of appellants, and Mrs. McMillan, the wife of deceased; Miss Eanes frequently visiting and staying at the house of McMillan, waiting upon, nursing, and ministering to Mrs. McMillan, who was at the time sick. The friendship thus formed continued after the removal of the McMillans to another place, some ten miles distant, where Miss Eanes, during the months of April, May and June, spent days and weeks at their house. In January, 1880, McMillan came after Miss Eanes and took her from home to his house, on an invitation to pay his wife a. visit. About the latter part of January, McMillan came with her in a wagon to the city of Austin, and left her at the house of a friend of hers. Early the next morning she left, saying she was going to an uncle's. On the 10th of February following, her father inquired for her of Mrs. McMillan, and learned for the first time that she was not there, and that she was missing and her whereabouts unknown. Search was immediately made for her, and appears to have been prosecuted without success until the 18th day of February, when her brother-in-law, Maurice Moore, having traced her to Round Rock, found her there, and brought her back with him to his house, on the evening of that day. The next morning she met her two brothers, these appellants, and told them that McMillan had committed a rape upon her, in consequence of which she was about to become a mother. This was the first time she had ever disclosed these circumstances to any of her family. Defendants came to the city of Austin, and about one o'clock went to the house of McMillan, where they met

his wife in a friendly manner, and had some conversation with her in regard to their sister, who, they led her to believe, had not yet been found. McMillan was not at home, and they said they wished to see him and left between one and two o'clock, saying they would return. About an hour afterwards they did return, and found McMillan, his wife and little daughter, at table, eating dinner. Wm. Eanes began to talk to McMillan about his sister's not being found, and spoke about a trunk which she had gotten from Mrs. McMillan before her departure. The color and description of the trunk was spoken of, when Mrs. McMillan said there was a trunk in the next room of exactly the same color, and McMillan and William Eanes got up and went into the adjoining room to see it. No word appears to have been spoken after they entered the other room, but almost instantaneously a shot was fired, and McMillan came running back into the room which they had just left, followed by William Eanes, who fired upon him until he fell a lifeless corpse at the feet of his wife. During the shooting neither party spoke. After McMillan fell, the defendants went out of the house, William Eanes pronouncing the single word, "sister."

We have thus briefly endeavored to present the leading features of the testimony as exhibited in the record. Most, if not all the facts, as we have detailed them, are undisputed and uncontradicted. In connection with these facts, the principal question for our determination is the correctness and sufficiency of the charge given by the court to the jury, as the law of the case. No complaint is urged to the charge so far as it relates to murder of the first and second degrees, except as to the manner of stating the rule of reasonable doubt when sought to be applied to the grade of offense; which objection will be noticed hereafter in another connection.

Upon manslaughter the charge is partly an almost

literal copy of the several articles 593, 594, 595, 596, 598 and 602 of the Penal Code. The pertinency and relevancy of a charge upon manslaughter was called for by the facts in evidence which are stated above,—one ground, and the chief one, of the defense being that defendants were not, to say the least of it, guilty of any higher crime, their sister having informed them only on the morning before the killing, of the wrong done her by deceased, and the killing having taken place a few hours later, at noon, and upon their first meeting with the deceased after receiving such information.

The general rules with regard to ordinary cases of manslaughter are modified necessarily by our statute in permitting this character of defense. It is expressly provided that "insulting words or conduct of the person killed towards a female relative of the party guilty of the homicide" (Penal Code, art. 597, subdiv. 4) shall be deemed an adequate cause to reduce a homicide from murder to manslaughter. Not only so, but the statute further provides that such cause shall be deemed sufficient if it is made to appear "that the killing took place immediately upon the happening of the insulting conduct or the uttering of the insulting words, *or so soon thereafter as the party killing may meet with the person killed, after having been informed of such insults.*" Penal Code, art. 598. Thus, it will be seen that one of the principal ingredients or elements of ordinary manslaughter, viz.: "that the provocation must arise at the time of the commission of the offense, and that the passion is not the result of a former provocation" (Penal Code, art. 594), is not applicable to a case where the insulting words or conduct were not indulged in in the presence of the slayer, for he may kill on the first meeting after learning that the provocation, of which he personally knew nothing, had been committed. Up to the time of this first meeting the law prescribes no limit for the subsidence of the passion

suppose 1 to be engendered by the information received. If the killing takes place on the first meeting, then it is true in this, as in all other cases, that, in order to reduce the offense to manslaughter, it is necessary, not only that the adequate cause (insulting words and conduct) existed to produce " anger, rage, resentment or terror, in a person of ordinary temper sufficient to render the mind incapable of cool reflection" (Penal Code, art. 594, subdiv. 3), but such state of mind must actually exist at the time of the commission of the offense. Penal Code, art. 602.

In such state of case the material questions to be solved are:

1. Were there insulting words or conduct on the part of the person killed towards a female relative of the slayer?

2. Was that the real cause which provoked and induced the killing?

3. Did the killing take place as soon as the party killing met with the person killed, after having been informed of the insult?

4. At the time of the killing was the slayer laboring under a degree of anger, rage, resentment or terror, such as would commonly, in a person of ordinary temper, render the mind incapable of cool reflection?

If each and all these questions can be answered affirmatively by the jury, then the accused would not, and should not in law, be found guilty of a higher crime than manslaughter. Pertinent and subordinate to, as well as directly and intimately connected with, these leading questions, are others of no less importance which should be explained, so as to be fully comprehended by the jury. As, for instance, that it is not necessary that they, the jury, should know of a verity that the adequate cause which induced the killing existed as a fact, provided that the party killing believed it and acted upon it as such. A mistake may exist and yet the guilt of the

accused must depend, in all mistakes of fact, not upon the existence or non-existence of the fact itself, but upon the circumstances as they appeared to and were understood by him.

Again, the jury should not be left in doubt as to the character of passion aroused by the provocation. It may be "anger," or "rage," or "sudden resentment;" not a combination of all. "Anger is a violent passion of the mind excited by a real or supposed injury, or by an injury offered to a relative or friend." It is not necessarily rage, nor transport of passion, nor delirium, though it may be inflamed into such conditions. (Webster's Dictionary.) These are but higher, and more demonstrative and uncontrollable types of its existence. It too often happens that the uneducated mind will confound the cause with the higher degrees, and require that the same external exhibitions shall indicate its presence. Such is not the fact. Anger may exist without any violent ebullition of passion, or even outward expression, and yet to such an extent as to render the mind incapable of cool reflection. It may present all " the torrent's smoothness ere it dash below," and its *indicia* are as varied as are the varied faces and dispositions of men.

Again, it is necessary that the jury should know and understand what, in law, is meant by and designated as " cooling time," — that is, time for the mind to become so calm and sedate, as that it is supposed to contemplate, comprehend, and coolly act with reference to the consequences likely to ensue.

These questions have been so fully and clearly discussed in *Maher* v. *The People*, 10 Mich. 213, and the principles of law governing them enunciated with such clearness and precision, that we cannot better express our views of the law than we find them declared in that opinion. That court, Judge Christiancy delivering the opinion, says: "To what extent the passions must be aroused and the

dominion of reason disturbed, to reduce the offense from murder to manslaughter, the cases are by no means agreed; and any rule which would embrace all the cases that have been decided in reference to this point would come very near obliterating, if it did not entirely obliterate, all distinctions between murder and manslaughter in such cases. We must, therefore, endeavor to discover the principle upon which the question is to be determined. It will not do to hold that reason should be entirely dethroned or overpowered by passion so as to destroy intelligent volition. Such a degree of mental disturbance would be equivalent to utter insanity, and, if the result of provocation, would render the perpetrator morally innocent. But the law regards manslaughter as a high grade of offense,— as a felony. On principle, therefore, the extent to which the passions are required to be aroused and reason obscured must be considerably short of this and never beyond that degree within which ordinary men have the power, and are therefore morally as well as legally bound, to restrain their passions. It is only on the idea of a violation of this clear duty that the act can be held criminal.  *   *   *   The principle involved in the question, and which I think clearly deducible from the majority of well considered cases, would seem to suggest, as the true general rule, that reason should, at the time of the act, be disturbed or obscured by passion to an extent which *might render* ordinary men of fair average disposition *liable* to act rashly or without due deliberation or reflection, and from passion rather than judgment. To the question what shall be considered in law a reasonable or adequate provocation for such a state of mind, so as to give to a homicide committed under its influence the character of manslaughter, on principle the answer as a general rule must be anything the natural tendency of which would be to produce such a state of mind in ordinary men, and which the jury are satisfied did produce it

in the case before them; not such provocation as must, by the laws of the human mind, produce such an effect with the *certainty that physical effects follow from physical causes;* for then the individual could hardly be held morally accountable. Nor, on the other hand, must the provocation in every case be held sufficient or reasonable because such a state of excitement has followed from it; for then, by habitual and long-continued indulgence in evil passions, a bad man might acquire a claim to mitigation which would not be available to better men, and on account of that very wickedness of heart which in itself constitutes an aggravation both in morals and law. In determining whether the provocation is sufficient or reasonable, *ordinary human nature,* or the average of men recognized as men of fair average mind and disposition, should be taken as the standard; unless, indeed, the person whose guilt is in question be shown to have some peculiar weakness of mind, or infirmity of temper, not arising from wickedness of heart or cruelty of disposition.   \*  \*  \*

"The same principles which govern as to the extent to which the passions must be excited and reason disturbed, apply with equal force to the time during which its continuance may be recognized as a ground for mitigating the homicide to the degree of manslaughter; or, in other words, to the question of 'cooling time.' This, like the provocation itself, must depend upon the nature of man and the laws of the human mind, as well as upon the nature and circumstances of the provocation, the extent to which the passions have been aroused, and the fact whether the injury inflicted by the provocation is more or less permanent or irreparable. The passion excited by a blow in a sudden quarrel, though perhaps equally violent for the moment, would be likely much sooner to subside than if aroused by a rape upon a sister or a daughter, or the discovery of an adulterous intercourse with a wife;

and no two cases of the latter kind would be likely to be identical in all their circumstances of provocation.   No precise time, therefore, *in hours or minutes,* can be laid down by the court as a rule of law within which the passions must be held to have subsided and reason to have resumed its control, without setting at defiance the laws of man's nature, and ignoring the very principle on which provc c ition and passion are allowed to be shown at all in mitigation of the offense.   The question is one of reasonable time, depending upon all the circumstances of the particular cases, and in a majority of cases is one peculiarly within the province of the jury to determine."   See also *State* v. *Holme,* 54 Mo. 154.

We have been led to make this extended extract from *Maher* v. *The People* because, in our opinion, it is the clearest exposition of manslaughter we have seen, and is in perfect harmony with our own views of the proper construction to be given to our own statutes upon the subject.

If the charge of the court in the case at bar is subjected to the test of the principles and rules above enunciated, we are clearly of opinion that it should be held insufficient in law.   It instructed the jury that "the provocation which produced the passion must have arisen at the time of the commission of the offense;" which, as we have seen, is not the law where insulting words and conduct are the provocation, and the provocation occurs in the absence of the slayer.   It was further calculated to impress upon the minds of the jury that there could be no anger sufficient in law to render the mind incapable of cool reflection, unless evidenced by "sudden transports of passion."   And it doubtless misled the jury as to cooling time by not, under the peculiar circumstances of this case, directing their minds specially to the fact whether the killing occurred upon the first meeting after the defendants had been informed of the provocation, and whether the tendency of the provocation at that time

was such as would be liable to produce in a person of ordinary temper a degree of anger sufficient to render the mind incapable of cool reflection. The question was not whether there was time to cool from the time their sister informed them in the morning of the wrongs that had been perpetrated upon her, but did the anger exist at the time of the meeting and their acting on the provocation?

In another portion of the charge the following language is used: "I charge you that there is no evidence before you that tends to excuse or justify the homicide, nor is there any evidence before you applicable to what the law calls negligent homicide." We are inclined to the opinion that such a charge, under the peculiar circumstances of this case, if appropriate in any case, was liable to be misconceived by, and to mislead the jury. In *Biggs* v. *State*, 29 Ga. 723, it was held excusable or justifiable homicide for one to kill a party who had ravished his sister,— though not the law in this State. At all events the charge is liable to the construction that, if the jury believed the defendants did kill the deceased, then, in no event, could they find them not guilty, but they must find them guilty of either murder in the first or second degree, or of manslaughter. This a court never has the right to do; it is the province of the jury alone, absolutely, to declare whether the accused is guilty or not guilty. In most instances a court is fully warranted in declining to charge upon a grade of offense, or a phase of case, where there is no evidence supporting it, and thereby withdrawing its consideration from the jury (*Berry* v. *State*, 8 Texas Ct. App. 515); but it is, to say the least of it, of exceedingly questionable propriety, whether in any case a court is ever warranted in telling a jury that there is no evidence of a lower grade where the offense admits of degrees; and that, too, in such manner as that they may feel it their bounden duty to convict anyhow of one of the higher grades.

Again: on the reasonable doubt the court charged the language of the statute, but added "and the rule of reasonable doubt applies to the grade of offense." To the legal mind such a charge would doubtless convey a correct idea and be amply sufficient; but to an ordinary jury it would scarcely apprise them of their duty in considering the degree of offense; that is, if they entertained a reasonable doubt of the higher, to let such doubt operate in determining in favor of the lesser degree. "Oftentimes it is of as great and vital importance to a defendant to have the benefit of whatever reasonable doubt may arise in determining the grade and degree of his crime, as in adjudging the general measure of his guilt." *Murray* v. *State*, 1 Texas Ct. App. 417; *Davis* v. *State*, 10 Ga. 101; 1 Leading Crim. Cas. (Bennett and Heard) pp. 359, 360.

It only remains for us to notice one other matter appearing of record, which in the way of bills of exception, statements, affidavits, and counter-affidavits, covers fifty-five pages of the transcript. During the closing argument of the county attorney, in commenting upon and deducing inferences from the evidence, which for aught that appears he had the right to do, he was interrupted in a very abrupt manner by the excited protestations of Maurice Moore, to whom he was alluding, and who was a brother-in-law of the defendants, and also indicted in a separate indictment as being an accomplice in the murder. Immediately a younger brother of the defendants rushed upon and struck the county attorney, whilst both defendants attempted to join in the melee, and one of them seized a chair and attempted also to strike with it. Excitement naturally rose instantly to the very highest pitch, and was participated in by the one hundred and fifty or two hundred spectators, who were present in the court room. The proceedings of the trial were stopped, and for a few moments the wildest confusion seems to have prevailed. Moore was ordered to jail by the court,

and was taken out by the sheriff.    Silence and order were
commanded by the officers of the court.    After order and
quiet were restored, the court ordered the county attorney
to proceed with his argument, and he requested the court,
before proceeding, to have the prisoners removed from
his rear, remarking that he did not wish to be assassinated.
Defendants were removed and counsel resumed his argu-
ment under much excitement.    He said "he might be
assassinated before he got through, but before he would be
intimidated by Maurice Moore, in the discharge of his
duty, he would see him dead and in hell and follow him
there."    At this remark the audience inside and outside
the bar applauded by clapping their hands, stamping their
feet, and by loud and vociferous cheers of approval.    The
proceedings of the trial were stopped and there was again
great confusion and excitement for some moments.
When order was again partially restored the court cen-
sured the audience, and remarked that "if the parties
causing this disturbance could be identified they should be
fined to the extent of the power of the court," and that
he "felt ashamed, mortified and humiliated, that such a
thing should occur while men were on trial for life."    In
resuming, the county attorney again spoke of defendants
and their attempt to assassinate him in the court house, to
which the defendants through counsel objected, when the
court made some remark about the latitude which would
be allowed counsel for the State, the substance of which
remark is not agreed upon in the two bills of exception.
Finally the court told the county attorney that he must
confine himself to the evidence.

The rule seems to be now well settled in practice that,
"where the counsel grossly abuses his privilege to the
manifest prejudice of the opposing party, it is the *duty*
of the court to stop him there and then.    If he fails to do
so and the impropriety is gross, it is good ground for a
new trial."    *Jenkins* v. *N. C. Ore Dressing Co.* 65 N. C.

563; *Thompson* v. *State*, 43 Texas, 268; *Hatch* v. *State*, 8 Texas Ct. App. 418; *House* v. *State*, 9 Texas Ct. App. 567; *State* v. *Smith*, 1 Amer. Crim. R. (Hawley) 580; *Ferguson* v. *State*, id. 582.

Such occurrences in the court house and during a trial for murder must of necessity have their influences upon the jury. Amidst such excitement it is scarcely to be imagined that they would be able to maintain that quiet, calm disposition and frame of mind which should never be diverted from, or for a moment lose sight of the grave and solemn issues they were called to decide. But these appellants and their relatives and friends were the primary cause of all that subsequently occurred. It would be a most dangerous precedent, and one I shall never be willing to sanction, that prisoners on trial for a felony may, by their own unjustifiable and outrageous conduct, by openly violating the law, and assaulting her officers in the very sanctuary of justice, create a state of circumstances which may have operated to prejudice their rights, and afterwards seek advantage of their own wrong and claim immunity from punishment because in all probability the extent of the punishment might have been affected, if it was not in fact superinduced, by these untoward circumstances. To allow them to do so would simply be to invite a recurrence of such acts and scenes in any and every case where a party was placed upon trial for felony and might not be willing to abide the result.

Such questions, however, should never be brought to this court for revision and adjudication, when, if the proper course is taken, they may be disposed of so promptly, and with so little trouble, in the court below. No effort should have been made to proceed with the trial during the pendency of the excitement. So soon as it reasonably became apparent that there was a disturbance, or the likelihood of one, which might affect the quiet of

the trial and perhaps influence its result, if unable to restrain it on the moment, the court of its own motion should have arrested the proceedings and postponed the trial until all such excitement had been entirely allayed, even if it should take days to do so, having in the meantime made all necessary preparation to enforce and maintain proper order and decorum upon the resumption of and during the subsequent progress of the trial. Had the court promptly pursued this plan much of the disturbance and outrageous conduct complained of would doubtless never have occurred.

The judgment of the lower court is reversed and the cause remanded for a new trial.

*Reversed and remanded.*